ANNETTE KINGSLAND ZIEGLER, J.
¶ 235. (dissenting). I join the dissent authored by Chief Justice Roggensack because I agree that, based on the arguments raised in this case, the respondents have failed to establish that the provisions of 2011 Wisconsin Act 21 ("Act 21") at issue are unconstitutional *553 beyond a reasonable doubt as applied to the Superintendent of Public Instruction ("SPI"). I write to emphasize a few points.
¶ 236. First, there are numerous significant areas of agreement between the lead opinion and Chief Justice Roggensack's dissent. Most importantly, the lead opinion and the dissent agree that the Wisconsin Constitution "gives the Legislature control over what powers the SPI and the other officers of supervision of public instruction possess in order to supervise public instruction" such that "the Legislature may give, may not give, and may take away the powers and duties of the SPI and the other officers of supervision of public instruction." Lead op., ¶ 70; see dissent, ¶ 189. The lead opinion and the dissent also agree that the SPI's ability to participate in the rulemaking process derives from statute, not the Wisconsin Constitution. Lead op., ¶¶ 35-37; dissent, ¶¶ 203-04.
¶ 237. One need look no further than Article X, Section 1 itself for these propositions: "The supervision of public instruction shall be vested in a state superintendent and such other officers as the legislature shall direct; and their qualifications, powers, duties, and compensation shall he prescribed by law." Wis. Const. Art. X, § 1 (emphases added). Our case law confirms this notion:
Article X, sec. 1, explicitly provides that the powers and duties of the school superintendent and other officers charged by the legislature with governing school systems "shall be prescribed by law." Because the constitution explicitly authorized the legislature to set the powers and duties of public instruction officers, Article X, sec. 1 confers no more authority upon those officers than that delineated by statute.
Fortney v. Sch. Dist. of West Salem, 108 Wis. 2d 167, *554 182, 321 N.W.2d 225 (1982) (emphasis added). Article X, Section 1 therefore does little more than create a constitutional position: the framers of the Wisconsin Constitution wanted to ensure that some officer was in place to oversee Wisconsin's system of public instruction. What supervision means in the context of public instruction, the framers left to the legislature to decide. The framers provided the clay; the legislature shapes it.
¶ 238. So much for the areas of agreement. Broadly speaking, the lead opinion and the dissent part ways on the question of whether the legislature can tie its own hands depending on the powers it grants the SPI and the duties it requires of the SPI. The court of appeals below clearly thought the answer to this question is yes. It stated, " [T]he legislature has the authority to give, to not give, or to take away SPI supervisory powers, including rulemaking power. What the legislature may not do is give the SPI a supervisory power relating to education and then fail to maintain the SPI's supremacy with respect to that power." Coyne v. Walker, 2015 WI App 21, ¶ 25, 361 Wis. 2d 225, 862 N.W.2d 606. Importantly, the court of appeals premised this principle on Thompson v. Craney, 199 Wis. 2d 674, 546 N.W.2d 123 (1996), in which we held that "the 'other officers' mentioned in [Article X, Section 1 of the Wisconsin Constitution] were intended to be subordinate to the state [SPI]" and that therefore "the legislature may not give equal or superior authority to any 'other officer.' " Thompson, 199 Wis. 2d at 698-99.
¶ 239. The lead opinion and the dissent agree that Thompson is not really at issue in this case, however, because the Governor and the Secretary of Administration are not Article X officers of public *555 instruction. See lead op., ¶¶ 39-40 ("[T]his case poses a different constitutional question than the question posed in Thompson. . . . [H]ere, the Legislature is attempting to give officers who are not officers of supervision of public instruction the ability to prevent the SPI from promulgating rules."); dissent, ¶ 227 ("Thompson was concerned with 'other officers' mentioned in Article X, § 1... . The matter before us does not concern the 'other officers' mentioned in Article X, § 1.").
¶ 240. Thus, the lead opinion does something new: it takes the Thompson idea that, with regard to Article X officers, "the legislature may not. . . give the SPI a supervisory power relating to education and then fail to maintain the SPI's supremacy with respect to that power," and applies it to individuals — the Governor and the Secretary of Administration — who are not Article X officers. Put differently, the lead opinion decides today that if the legislature grants the SPI a power, the SPI must have "supremacy with respect to that power" both with regard to Article X officers and with regard to non-Article X officers.
¶ 241. In so doing, the lead opinion seriously errs. To see why, let us follow the lead opinion's chain of reasoning. We begin with the lead opinion's premises: (1) the legislature may "give, may not give, and may take away the powers and duties of the SPI and the other officers of supervision of public instruction," that is, the manner in which the SPI and other officers supervise public instruction, lead op., ¶¶ 70, 72; (2) the legislature has defined the supervision of public instruction to include rulemaking, lead op., ¶ 35; (3) the supervision of public instruction, however defined by the legislature, must be vested in the SPI and the other officers of supervision of public instruction, *556 lead op., ¶ 63; (4) the Governor and the Secretary of Administration are not Article X officers, id.; and (5) the legislature has given the Governor and the Secretary of Administration "the power to make the decision on whether the rulemaking process can proceed," lead op., ¶ 68. Now, the denouement: "By giving the Governor the power to prevent the SPI's and DPI's proposed rules from being sent to the Legislature, Act 21 [unconstitutionally] gives the Governor the authority to [supervise] public instruction." Lead op., ¶ 65.
¶ 242. I cannot subscribe to this reasoning because it fails to account for the unconquerable nature of the first of the premises listed above: the legislature may give, may not give, and may take away the powers and duties of the SPI and the other officers of supervision of public instruction, that is, the manner in which the SPI and other officers supervise public instruction. We have stated this idea before: "Article X, sec. 1 confers no more authority upon. . . officers [of supervision of public instruction] than that delineated by statute." Fortney, 108 Wis. 2d at 182. Thus, the supposed limit on the legislature's authority envisioned by the lead opinion is not really a limit at all; the legislature can simply redefine the " supervision of public instruction" in a way that accommodates that which the legislature wishes to achieve.
¶ 243. More specifically, in the lead opinion's view, the legislature defined "supervision of public instruction" to mean (in part) "rulemaking," and "rule-making" to mean "the ability to promulgate public instruction-related rules." But rulemaking is not some unchangeable Platonic Form. I see nothing in Article, X, § 1 that prevents the legislature from defining "supervision of public instruction" to mean (in part) *557 "rulemaking," and "rulemaking" to mean "the ability to promulgate public instruction-related rules subject to gubernatorial approval."
¶ 244. Imagine that, prior to 2011, the legislature had never given the SPI any authority to participate in the rulemaking process, and that Act 21 represented the legislature's first grant of rulemaking authority to the SPI — rulemaking subject to gubernatorial approval. Act 21 would thus represent an expansion, not a contraction, of the SPI's powers. Why would this be unconstitutional? The legislature is simply "prescrib[ing]" the "powers" of the SPI under Article X, Section 1 of the Wisconsin Constitution. It cannot be that the legislature can only expand, and never contract, powers. Under the lead opinion's reasoning, the legislature's ability to "prescribe[]" the SPI's "powers" is so limited. The lead opinion's logic suggests that if any power is to be prescribed to the SPI, it must be prescribed without any limitation. This logic is fundamentally flawed because this requirement is not found in the Wisconsin Constitution.
| 245. Article X, Section 1 vests the SPI with the supervision of public instruction and states that the SPI's "powers . . . shall be prescribed by law," not that its "other powers" shall be prescribed by law. Wis. Const. Art. X, § 1; see Fortney, 108 Wis. 2d at 182. Thus while it is true that Article X vests the SPI with " [t]he supervision of public instruction," Act 21 cannot be unconstitutional because the "supervision of public instruction" is some independent power of the SPI. Further, this court has already determined that " [p]ub-lic instruction and its governance had no long-standing common law history at the time the Wisconsin Constitution was enacted." Fortney, 108 Wis. 2d at 182. *558 "Supervision of public instruction" connotes no special grant of common law powers.[1]
¶ 246. So this case is not, ultimately, about the powers of the SPI. It is instead about whether the legislature can create a chain of command. The lead opinion concludes that it is not within the province of the legislature to create such a chain of command. The words of the constitution do not so limit the legislature.
¶ 247. Is the lead opinion correct to conclude that if the SPI supervises public instruction, and the Governor supervises the SPI, then the Governor is (unconstitutionally) supervising public instruction? The answer is no, because it is not really the Governor who is supervising (or even obstructing, if one prefers) the actions of the SPI; it is the legislature. That is, built into the very idea of the SPI's supervision of public instruction is the idea that this supervision will forever be qualified and controlled by the legislature. It is the legislature that defines what "supervision of public instruction" is;" [p]ublic instruction and its governance had no long-standing common law history at the time the Wisconsin Constitution was enacted." Fortney, 108 Wis. 2d at 182. It is the legislature which determines the powers the SPI may wield, and the way in which *559 the SPI may wield those powers. See Wis. Const. Art. X, § 1. In short, it is the legislature which decides what it means to supervise public instruction in Wisconsin. The legislature has determined through Act 21 that the supervision of public instruction in Wisconsin means, in part, participation in the rulemaking process with respect to specific matters and subject to gubernatorial approval. Alas, the lead opinion determines that our state constitution prohibits the legislature's actions.
¶ 248. The lead opinion's conclusions today could yield undesirable and unintended consequences. Suppose the legislature, in light of school shootings in recent years, decides to increase security at Wisconsin's public schools. The legislature might wish to provide the SPI with rulemaking authority over the implementation of this plan. But, given the nature of the issue, the legislature might also conclude that the Governor's input on any proposed rules should be dispositive. Under the lead opinion today, it seems that the legislature could: (1) give the SPI the authority to pass rules on school security without conditioning the submission of these rules to the legislature on the Governor's approval; or (2) give the Governor's office a measure of authority over the implementation of the plan, without involving the SPI at all. What it could not do, at least apparently, is give the SPI the authority to pass rules on school security, subject to the approval of the Governor; the lead opinion's reasoning suggests that while the legislature need not give any authority at all to the SPI on a matter such as public school security, if it in fact chooses to give any such authority, that authority must be unfettered. I fail to see why Article X, Section 1 would require such an outcome, given that that provision provides that the *560 powers of the SPI are prescribed by the legislature. Wis. Const. Art. X, § 1. The legislature may reasonably wish to give the SPI qualified authority over the implementation of the law at issue, yet the lead opinion forces the legislature to choose between two imperfect solutions.
¶ 249. I suspect that the reason the dissent's view leaves a sour taste in the lead opinion's mouth is because the SPI, under the dissent's interpretation, is a rather weak entity, at least insofar as it is subject to the changing whims of the legislature. But this consequence is dictated by the broad language of Article X, Section 1, which gives virtually complete authority over the SPI to the legislature. The framers did not provide that the SPI constitutes the fourth branch of our state government. That the plain language[2] of *561 Article X does not leave the SPI with some set of "core" powers is not a problem for this court to resolve. See Lead op., ¶ 79.
¶ 250. The last point I wish to discuss is the lead opinion's conclusion that Act 21 is unconstitutional "as applied." Unlike the lead opinion, I conclude that the respondents fail to establish that Act 21 is unconstitutional beyond a reasonable doubt as applied to the SPI because they have not shown that Act 21 has actually been applied to the SPI. The respondents do not assert *562 that the Governor or the Secretary of Administration have rejected a rule proposed by the SPI or the DPI, or have, for instance, rendered the SPI powerless by rejecting every rule it and the DPI have promulgated since Act 21's passage. See dissent, ¶ 231 ("No proof has been submitted that either Wis. Stat. § 227.235(2) or Wis. Stat. § 227.185 has been unconstitutionally enforced against the Superintendent."). Despite the lead opinion's conclusions, I am not convinced that this case is in fact an as-applied challenge. The SPI is really arguing that Act 21 is always unconstitutional when the entity concerned is the SPI. And although this is a declaratory judgment action, this matter is not ripe.
¶ 251. The lead opinion responds that "Act 21 does not have to have been enforced for Coyne to properly bring a claim via a declaratory judgment action," because the "Uniform Declaratory Judgments Act, Wis. Stat. § 806.04, allows 'controversies of a justiciable nature to be brought before the courts for settlement and determination prior to the time that a wrong has been threatened or committed.' " Lead op., ¶¶ 27-28 (citing Olson v. Town of Cottage Grove, 2008 WI 51, ¶ 28, 309 Wis. 2d 365, 749 N.W.2d 211). This argument is fine so far as it goes, but the problem is that it is not clear how far it goes: "Though the authority to declare rights under the Uniform Declaratory Judgment Act is broad, it is not unlimited in scope." Putnam v. Time Warner Cable of Se. Wis., 2002 WI 108, ¶ 72, 255 Wis. 2d 447, 649 N.W.2d 626 (Sykes, J., dissenting in part) (citation omitted). As the lead opinion points out, a controversy is not justiciable for purposes of a declaratory judgment action unless it is "ripe for judicial determination." Lead op., ¶ 28 (citation omitted). "The basic rationale of the 'ripeness' *563 doctrine is to prevent courts, through avoidance of premature adjudication, from entangling themselves in abstract disagreements over administrative or . . . legislative policies." Lister v. Bd. of Regents, 72 Wis. 2d 282, 308, 240 N.W.2d 610 (1976). Ripeness requires that "the facts be sufficiently developed to allow a conclusive adjudication." Olson, 309 Wis. 2d 365, ¶ 43 (citations omitted). I have significant doubts that this court possesses the information it needs to pronounce a wholesale invalidation of the challenged provisions of Act 21 as they apply to the SPI.
I 252. The lead opinion argues that Walker and Huebsch did not contest ripeness (among other things) below, lead op., ¶ 28, but that is not dispositive. " [T]he question of ripeness may be considered on a court's own motion." Nat'l Park Hosp. Ass'n v. Department of Interior, 538 U.S. 803, 808 (2003) (citation omitted); see also Blanchette v. Conn. General Ins. Corps., 419 U.S. 102, 138 (1974) ("[T]o the extent that questions of ripeness involve the exercise of judicial restraint from unnecessary decision of constitutional issues, the [c]ourt must determine whether to exercise that restraint and cannot be bound by the wishes of the parties.").
¶ 253. Though styling the case as an as-applied challenge, the lead opinion concludes that, beyond a reasonable doubt, the challenged provisions of Act 21 can never be applied constitutionally to the SPI. See lead op., ¶¶ 4, 24-30. In my view, the facts have not sufficiently developed to permit such a sweeping conclusion. Assuming the Governor will eventually reject a proposed rule, we do not know what the substance of that rule will be, whether the rule impinges on any constitutional powers of the Governor, what reasons, if any, the Governor might have for rejecting a proposed *564 rule, what changes, if any, the Governor might request, and so on. " [I]n an as-applied challenge, we assess the merits of the challenge by considering the facts of the particular case in front of us, 'not hypothetical facts in other situations.'" State v. Wood, 2010 WI 17, ¶ 13, 323 Wis. 2d 321, 780 N.W.2d 63 (citation omitted). Yet the focus of the lead opinion is precisely that— hypothetical facts in other situations. See, e.g., lead op., ¶ 68 (" [A] Governor at loggerheads with an SPI over the content of a proposed rule, or a proposed rule change, could use the threat to withhold approval as a means of affecting the rule content" (citation omitted).).
¶ 254. Although it would not formally invalidate Act 21 as under a facial challenge — Act 21 remains in effect with respect to entities other than the SPI — the lead opinion acknowledges that the respondents' action "contains elements of. . . a facial. . . challenge." Lead op., ¶ 26. The respondents claim that, where the SPI is involved, Act 21 "cannot be enforced 'under any circumstances.' " Wood, 323 Wis. 2d 321, ¶ 13. It seems, then, that as to the SPI, the lead opinion concludes that Act 21 is always invalid, not just under "the facts of the particular case in front of us." Id. I would conclude that this facial challenge does not survive scrutiny.
¶ 255. The Supreme Court of the United States has stated:
Facial challenges are disfavored for several reasons. Claims of facial invalidity often rest on speculation. As a consequence, they raise the risk of "premature interpretation of statutes on the basis of factually barebones records." Facial challenges also run contrary to the fundamental principle of judicial restraint that courts should neither "anticipate a question of *565 constitutional law in advance of the necessity of deciding it" nor "formulate a rule of constitutional law broader than is required by the precise facts to which it is to be applied." Finally, facial challenges threaten to short circuit the democratic process by preventing laws embodying the will of the people from being implemented in a manner consistent with the Constitution. We must keep in mind that "[a] ruling of unconstitutionality frustrates the intent of the elected representatives of the people."
Wash. State Grange v. Wash. State Republican Party, 552 U.S. 442, 450-51 (2008). These considerations apply to the present case, and bolster my conclusion that this case is not in the proper posture for the determination the lead opinion makes today.
¶ 256. Today's decision is not really a victory for the SPI — or Wisconsin, for that matter. It is easy to see where Coyne v. Walker could take us. If the legislature cannot maintain what it views as sufficient control over the SPI's exercise of its powers, it could simply exercise its own authority to remove those powers, even though a grant of qualified authority to the SPI might well have benefitted public instruction in Wisconsin more than a complete absence of any such authority. Rulemaking stems in part from the fact that " [t]he legislature recognizes the need for efficient administration of public policy. . . . The delegation of rule-making authority is intended to eliminate the necessity of establishing every administrative aspect of general public policy by legislation." Wis. Stat. § 227.19(l)(b) (2013-14) (emphasis added). Given today's decision, the legislature may feel compelled to pass legislation regarding these administrative aspects of public instruction, even though it might otherwise have delegated this authority to the SPI, sub *566 ject to gubernatorial review. In my view, Article X, Section 1 does not require such an inefficient result.
¶ 257. In sum, I join the dissent authored by Chief Justice Roggensack because I agree that, based on the arguments raised in this case,[3] the respondents have failed to establish that the provisions of Act 21 at issue are unconstitutional beyond a reasonable doubt as applied to the SPI.
¶ 258. For the foregoing reasons, I respectfully dissent.
¶ 259. I am authorized to state that Justice REBECCA G. BRADLEY joins this dissent.

 This case, which involves the SPI's authority under Article X, section 1 of the Wisconsin Constitution, should therefore be distinguished from cases involving a provision "which incorporates an ancient common law office, possessing defined powers and duties, into the constitution." Fortney v. School Dist. of West Salem, 108 Wis. 2d 167, 182, 321 N.W.2d 225 (1982). For instance, " [p]rior decisions of this court held that the sheriff, under common law, had certain powers and duties in his relationship to the courts which were incorporated into the constitution. The sheriff cannot be divested of those powers and duties by statute." Id. The lead opinion today would not affect existing law on these types of offices.

 The lead opinion states:
When interpreting a constitutional provision we do not rest our analysis on the language of the provision alone. Rather, we also consult the constitutional debates and the practices in existence at the time of the writing of the constitutional provision and the interpretation of the provision by the Legislature as manifested in the laws passed following its adoption.
Lead op., ¶ 52 (citation omitted).
"Our methodology in interpreting a constitutional provision is not identical to our methodology in interpreting a statute." Dairyland Greyhound Park, Inc. v. Doyle, 2006 WI 107, ¶ 114, 295 Wis. 2d 1, 719 N.W.2d 408 (Prosser, J., concurring in part, dissenting in part). Although justifications for this divergence have, in the past, been provided, see, e.g., id., ¶ 116, I am not convinced that the current methodology this court uses to interpret constitutional language is sound. See, e.g., State ex rel. Kalal v. Circuit Court for Dane Cty., 2004 WI 58, ¶ 52, 271 Wis. 2d 633, 681 N.W.2d 110 ("Ours is 'a government of laws not men, and 'it is simply incompatible with democratic government, or indeed, even with fair govern *561 ment, to have the meaning of a law determined by what the lawgiver meant, rather than by what the lawgiver promulgated.' ... 'It is the law that governs, not the intent of the lawgiver. . . . Men may intend what they will; but it is only the laws that they enact which bind us" (citations omitted).); Antonin Scalia & Bryan A. Garner, Reading Law: The Interpretation of Legal Texts 375 (2012) ("The English judges have frequently observed, in answer to the remark that the legislature meant so and so, that they in that case have not so expressed themselves, and therefore the maxim applied, quod voluit non dixit [What it wanted it did not say]." (quoting 1 James Kent, Commentaries on American Law 467 (1826)); Daniel R. Suhr, Interpreting the Wisconsin Constitution, 97 Marq. L. Rev. 93, 120 (2012) ("The considerations that drove the [Wisconsin Supreme Court's] majority in Kalal should lead it to reject the current method it uses to interpret the state constitution. The [current] methodology relies on flawed sources in a futile attempt to discover a mythical common intent.").
Additionally, this methodology was not previously applied in Coulee. See Coulee Catholic Schools v. LIRC, 2009 WI 88, 320 Wis. 2d 275, ¶ 57, 768 N.W.2d 868 (interpreting the Wisconsin Constitution and stating, "The authoritative, and usually final, indicator of the meaning of a provision is the text — the actual words used"); id., n.25 ("In this case, we see little reason to extend our interpretation beyond the text."). Consequently, I would be willing to reexamine the methodology this court currently employs when interpreting constitutional text.

 The legislation in this case raises a host of constitutional questions that, appropriately, are not answered by the lead opinion. For instance, the lead opinion does not examine whether Act 21's grant of authority to the Governor and Secretary of Administration to reject proposed rules contains or need contain an ascertainable legislative purpose and procedural safeguards to ensure that the Governor and Secretary of Administration act within that purpose in exercising their authority. Cf. J.F. Ahern Co. v. Wisconsin State Bldg. Com'n, 114 Wis. 2d 69, 90, 336 N.W.2d 679 (Ct. App. 1983) (citing Watchmaking Examining Bd. v. Husar, 49 Wis. 2d 526, 536, 182 N.W.2d 257 (1971)).